MARY AGNES POTTER, Respondent, *v.* THOMAS L. OGDEN et al., Executors, etc., Appellants.

The sureties upon an administrator's bond remain liable until they can show payment by him to the parties legally entitled to receive the assets, and when the sole defense to an action upon the bond is a technical and constructive transfer of liability from the administrator as such to himself as guardian, this must be clearly established, so as to leave no doubt of the liability of the sureties upon his bond as guardian.

The appointment of a special guardian for an infant in proceedings in a Surrogate's Court, is void unless previous to such appointment, jurisdiction over the infant has been required by the service of a citation in the manner prescribed by law.

Where certain facts are to be proved to a court having only special and limited jurisdiction in order to give it jurisdiction, a total defect of evidence renders its action void; it is only when there is some evidence that the decision of the court as to its sufficiency is conclusive.

The change wrought by the provision of the Code of Civil Procedure (§ 2606), in reference to the method of establishing a *devastavit* in an action upon the bond of a deceased administrator, merely affects the remedy, not the liability, and so is not within the exception (§ 2610) which declares that the article containing the provision shall "not affect in any manner the liability of the sureties in a bond executed" before the chapter took effect.

Accordingly *held*, that said provision was applicable to a case where the bond was given before its enactment, and, therefore, that a decree against an administrator of the deceased administrator, rendered upon his accounting, had the same effect "as if an execution, issued upon a surrogate's decree against the property of decedent, had been returned unsatisfied during decedent's lifetime."

In an action upon the bond of M., a deceased administrator of the estate of H., plaintiff gave in evidence a surrogate's decree upon the accounting of the administrator of M., by which it was found that M. died before the estate, in his hands as administrator, was fully administered; that there was due and unpaid from him to plaintiff a sum specified, and that after his death his administrator had and could find no assets, either of said estate or of the estate of M. The decree adjudged payment to plaintiff out of the assets of the estate of H. *Held*, that the decree was sufficient; that its office was to determine whether, at M.'s death, any assets of the estate of H. remained, and having determined this and also that no assets of either estate came to the hands of the administrator of M., a further formal judgment was unnecessary.

Defendants claimed that on May 2, 1877, plaintiff's share was in the hands of M., intact and undiminished, and on that day, in pursuance of the

Statement of case.

decree of the surrogate on the final accounting of M., it was transferred by himself as administrator to himself as general guardian of plaintiff, whereby M. was discharged as administrator, and his sureties released. The decree was objected to on the ground that no jurisdiction over plaintiff was acquired by the surrogate, and so that it was not binding upon her. It appeared that upon the accounting plaintiff was represented by S. as special guardian; she was then about nine years old. The record showed the appointment of S. on February 14, 1874, the day the citation was issued; this was personally served on plaintiff February twenty-fifth, in Canada, where she was temporarily, her residence being with her father in this state. There was no proof of service of the citation upon plaintiff's father, or any person with whom she resided. A citation was published in a county paper for five weeks, and in the state paper for three months, the publication beginning in October, 1873. *Held,* that there was no proper service of the citation upon plaintiff; and so, that the appointment of the special guardian was void, and as the surrogate obtained no jurisdiction over plaintiff, the decree was not binding upon her. (2 R. S. 93, § 61; Code of Procedure, § 134, chap. 156, Laws of 1874, §§ 1, 2; chap. 362, Laws of 1863.)

While plaintiff was still a minor said decree was amended by striking out the clause authorizing M. to retain as general guardian, plaintiff's share. Five years thereafter plaintiff moved to have said decree amended in other particulars. *Held,* that if the motion bound plaintiff by the decree it could only be to the decree as it then existed, not as it originally was.

To show that M. was in fact appointed general guardian of plaintiff, defendants produced entries in the surrogate's book of minutes, one ordering that M. be appointed guardian on executing a prescribed bond, the other simply ordering his appointment, both of which were signed by the surrogate, also an unsigned appointment of M., in the guardian book, unsigned letters of guardianship and a bond of M., as guardian with two sureties approved by the surrogate. The unsigned appointment and letters showed on their face that they were incomplete and on the day of the entries there was no petition before the surrogate for the appointment of M., and no consent by him, although the letters as prepared recited such consent. *Held,* that the proof failed to show an appointment; that this is completed only by the delivery of signed and sealed letters, after their record in the guardian's book; and that at least until they were signed ready for delivery, the guardian had no power to act.

An order or direction in the minutes of the court that a person " be appointed guardian " is not an appointment made where such an appointment is required to be made certified and recorded in a particular manner.

Reported below, 65 Hun, 27.

(Argued December 2, 1892; decided January 17, 1893.)

APPEAL from order of the General Term of the Supreme Court in the first judicial department, made June 29, 1892, which sustained plaintiff's exceptions taken upon the trial to the granting of a motion to dismiss the complaint and granted a new trial.

This action was brought upon the bond given by John W. Mills, as administrator of Abigail Hall, deceased, against defendants, as executors of the last will and testament of Samuel E. Lyon, deceased, who was one of the sureties on said bond.

The facts, so far as material, are stated in the opinion.

*John E. Parsons* for appellants. There has been no such proper determination of a devastavit on the part of Mills as will enable the plaintiff to maintain this action against the sureties on Mills' bond. (Code Civ. Pro. §§ 2553, 2554, 2605, 2609, 2610; *Scofield* v. *Churchill*, 72 N. Y. 565; Cooley on Const. Lim. [5th ed.] 368, 369; *Hood* v. *Hood*, 85 N. Y. 561; *Townsend* v. *Whitney*, 75 id. 425.) The decree of May 2, 1877, effected an immediate transfer of the plaintiff's share of the estate of Abigail Hall, deceased, from Mills, as administrator, to Mills, as general guardian, and thereafter he was accountable for the same to the plaintiff in his capacity as general guardian only, and the sureties on his bond as administrator were released from liability for any devastavit. (*Taylor* v. *DeBlois*, 4 Mason, 131; *Pratt* v. *Northam*, 5 id. 95; *Hall* v. *Cushing*, 9 Pick. 395; *Conkey* v. *Dickinson*, 13 Metc. 51; *Laytin* v. *Davidson*, 95 N. Y. 263.) The decree of May 2, 1877, is binding upon the plaintiff. (2 R. S. §§ 61, 62, 93, 94; *Brown* v. *Landon*, 30 Hun, 57; *Johnson* v. *Johnson*, 67 How. Pr. 144.) There was no ground for the plaintiff's contention that Mr. Mills had not been regularly appointed the general guardian of the plaintiff prior to the decree of May 2, 1877, and that he was not, therefore, such general guardian at that time. (3 R. S. [5th ed.] § 5; Laws of 1837, chap. 460, § 44; *People ex rel.* v. *Wilcox*, 22 Barb. 178; *Lewis* v. *Dutton*, 8 How. Pr. 99.)

*John D. Kernan* for respondent. Sections 2606 and 2607 of the Code of Civil Procedure apply to the bond in suit. (Laws of 1880, chap. 245; *Hood* v. *Hood*, 85 N. Y. 561; *Perkins* v. *Stimmel*, 114 id. 309; *Hood* v. *Hayward*, 124 id. 1.) The liability of sureties on official bonds is not impaired by the amendment of remedies existing at the time of their execution, the substitution of others or changes in the rules of evidence. (*People ex rel.* v. *Ryder*, 124 N. Y. 500.) The decree against Charles A. Hall, as administrator of John W. Mills, deceased, gave a complete cause of action to the plaintiff against the defendants, there being no fraud or collusion alleged or proved. (Code Civ. Pro. §§ 2606, 2608; *Perkins* v. *Stimmel*, 114 N. Y. 359; *In re Clark*, 119 id. 427; *Dayton* v. *Johnson*, 69 id. 419, 425, 426; *Bolton* v. *Shiever*, 26 Abb. [N. C.] 230, 232; Code Civ. Pro. § 2473; Redfield on Sur. Prac. [3d ed.] 53, 403, 404; *Deobold* v. *Oppermann*, 111 N. Y. 531; *Dodge* v. *St. Johns*, 96 id. 260; *Boyle* v. *St. Johns*, 28 Hun, 454; *Schofield* v. *Churchill*, 72 N. Y. 565; *Hood* v. *Hayward*, 124 id. 1.) The provision in the decree of May 2, 1877, that Mills pay and distribute to John W. Mills, as general guardian of Agnes Hall, and that he retain, as such general guardian, her share, is no defense. (*Dayton* v. *Johnson*, 69 N. Y. 426; *Johnson* v. *Lawrence*, 95 id. 155; *In re Hubbard*, 82 id. 90, 94; *In re Roosevelt*, 2 Law Bull. 59; *Hood* v. *Hood*, 85 N. Y. 561, 572; *Davis* v. *Crandall*, 101 id. 311, 321; *Bellamy* v. *Gaul*, 62 How. Pr. 460; *Pinckney* v. *Smith*, 26 Hun, 524; *Hood* v. *Hood*, 85 N. Y. 561; *In re Munro*, 15 Abb. Pr. 363; *Crozier* v. *C. S. Co.*, 27 Hun, 215.) The action can be maintained under the 1877 decree alone. (*Deobold* v. *Oppermann*, 111 N. Y. 531; *N. T. Bank* v. *Wetmore*, 124 id. 241.) The admissions of Mills contained in the accounting proceedings are competent evidence against the defendants as the representatives of the surety on his official bond. They are a part of the *res gestæ* of acts for the faithful performance of which his sureties covenanted in their bond. (*Bissell* v. *Saxton*, 66 N. Y. 55; *Bd. Suprs.* v. *Bristol*, 99 id. 316; *Hatch* v. *Elkins*, 65 id. 489.) The admissions and

declarations of Lyons are competent against the defendants. (*Bullis* v. *Montgomery*, 50 N. Y. 352, 358; Abb. Tr. Ev. 59, 60.) There was no question of fact to be sent to the jury. (*Dwight* v. *Ins. Co.*, 103 N. Y. 358.) The plaintiff was entitled to recover on the evidence in the case, even though it should be held that she could not rely on the decree of 1877, or that section 2606 does not apply. (*Haight* v. *Brisbin*, 100 N. Y. 219.) This court is not limited to the grounds of reversal stated in the General Term opinion. (*Mackey* v. *Lewis*, 73 N. Y. 382; *Krikeler* v. *Thaule*, 73 id. 608; *Simpkins* v. *Low*, 54 id. 179.) The right to move for an extra allowance granted by the trial court should be preserved. (*Parrott* v. *Sawyer*, 26 Hun, 466; *Jermain* v. *L. S. & M. S. R. Co.*, 31 id. 558; *Brown* v. *F. L. & T. Co.*, 24 Abb. [N. C.] 160; *People* v. *N. Y., L. E. & W. R. R. Co.*, 47 Hun. 43; 2 Rumsey's Pr. 522.)

FINCH, J. In the childhood of the plaintiff, and when she was about six or seven years old, her grandmother died, leaving an estate, the infant's distributive share of which was something over ten thousand dollars. The law, as usual, undertook to preserve it for her in pity for her incapacity, but was unfortunate both in the choice of its agents and the ultimate results of the control which it asserted. The child, grown up to womanhood, asks the court whose ward she has been for the property which it kept from her hands, and is told that it is utterly lost and wasted, that possibly one of two groups of sureties may be liable for it, and that she is at liberty to ascertain which and sue for her inheritance. I approach the questions involved, therefore, impressed with the abstract justice of the plaintiff's demand, and with a conviction in which we all share that somebody is and should be responsible to her for the restoration of her property.

Her grandmother's estate passed into the hands of John W. Mills and Jane E. Kelemen as administrator and administratrix, who were duly appointed by the surrogate of Westchester county on June 10, 1872. They gave a joint and several bond

in the usual form conditioned for the faithful performance of their duties upon which Samuel E. Lyon, defendant's testator, became liable as one of the sureties. Mills died in 1884 insolvent and unable to pay his debts, and in September of 1889, Charles A. Hall was appointed administrator of his estate, and after duly qualifying entered upon the performance of his duties. In 1890 the plaintiff who had become of age, called him to account for the unadministered estate and assets of her grandmother, Abigail Hall, for which Mills was alleged to have been responsible at the date of his death; and a decree was entered in the Surrogate's Court of Westchester county, in and by which it was found and adjudged that Mills died before the estate of Abigail Hall in his hands was fully administered; that there was due and unpaid to the plaintiff from him as administrator the sum of $11,188.23 on the 2d day of May, 1877; that the same was never paid over or accounted for by him as such administrator; and that after his death his administrator had and could find no assets either of the Hall estate or of the intestate, save about one hundred dollars in household furniture. The accounting thus showed that the estate of Abigail Hall and that of Mills were each a total wreck. The decree formally adjudged payment to the plaintiff out of the assets of Abigail Hall, deceased. The plaintiff testified that nothing had ever been paid to or received by her on account of her distributive share, and thereupon rested her case. She had fully established *prima facie* a right of recovery against the sureties. The appointment of Mills as administrator, the execution of the bond, his receipt and possession of the estate, the amount of his liability to plaintiff for her distributive share, his neglect to pay it over, his total waste of the whole fund and his own utter insolvency, had all been established by competent evidence, when the plaintiff rested, and showed a *devastavit*, for which the bondsmen of the adminstrator were liable.

The burden of a defense was thus shifted over to them, and they met it in two ways: First, by an attack upon the suffi-

ciency of the method adopted to prove a *devastavit;* and second, by the affirmative defense of payment to the general guardian of the infant.

It was contended that the provisions of the Code of Civil Procedure, which were followed and adopted by the plaintiff in establishing a *devastavit,* have no application to a case where the bond was given before the enactment of the Code, and when another and different process was required. The change, however, was a mere alteration of the remedy affecting only the practice to be pursued, and the method in force when the remedy is sought is the one to be followed, unless the statute enacts to the contrary. There is no vested right in a rule of evidence, (*People ex rel. Miller* v. *Ryder*, 124 N. Y. 500, *People* v. *Turner*, 117 id. 233), and the change in the present case is merely in the proof necessary to establish a *devastavit.* Under the old practice, in the lifetime of the administrator, it was the return of a sheriff that no property could be found to satisfy the execution against him; under the new, after his death, it is the decree of the surrogate on the accounting of the successor. But without disputing the general doctrine, the contention here is that section 2606 of the Code, under which this action is brought, has no application to the bond in controversy, because section 2610 expressly enacts: " The provisions of this article apply to an executor, administrator or guardian to whom letters have been issued, and to a testamentary trustee whose trust has been created before this chapter takes effect, except that it does not affect in any manner the liability of the sureties in a bond executed before this chapter takes effect." Of course, as the General Term suggests, the exception would repeal utterly the provision to which it is annexed, if by " liability," was at all meant the method of enforcing such liability. There were in the article some new provisions apparently extending the liability of executors and administrators, to meet which the exception was deemed necessary, but the terms of § 2606 relate wholly and exclusively to the remedy, and in no manner alter the original liability upon the bond. The sureties, before the

Code, were liable for a *devastavit* of the administrator, and are liable for exactly the same thing now, the mode of proving it alone having been changed.    Before the Code, the return of an execution *nulla bona* issued in the lifetime of the administrator, would have been sufficient evidence of a waste of the assets; after his death, instead of a suit in equity, a decree against the successor in administration is given the same effect. In both cases, the person who would have had the assets if there had been no waste, is shown not to have them, and whether that appears from the return of a sheriff in the lifetime of the delinquent, or from the accounting of his successor, after his death, the result is the same, and one is no more conclusive than the other.    It is a question only of remedy, and of procedure.

But it is further said that the surrogate's decree against the successor of Mills, was insufficient, because it decreed payment out of the assets of Abigail Hall.    Its office was to determine whether at the date of Mills' death any such assets remained. If they did, they were presumed to have come to the hands of the successor, and a decree on his accounting that they had not, was a necessary preliminary.    (*Perkins* v. *Stimmel*, 114 N. Y. 359.) Such fact the decree adjudged and determined, and beyond that, established that there were no assets of either estate in the hands of the administrator of Mills.    So long as there was nothing to reach, and the decree showed that fact, a further formal judgment, in addition to the substantial one, against the assets of Mills, would have been useless for any purpose.

Beyond these special objections lies the real field of the controversy.    The sureties claim that the distributive share of the plaintiff was in the hands of Mills as administrator, intact and undiminished, on the 2d day of May, 1877, and on that day in pursuance of the order of the surrogate was transferred by himself as administrator to himself as general guardian of the plaintiff, whereby he was discharged as administrator and his sureties in that character released, and that he then became further bound as guardian so that the plaintiff's proper and only recourse is upon the guardian's bond.    That is practically

a plea of payment, a defense that the debt due plaintiff from the administrator was discharged by payment to her legally appointed and properly authorized representative. The burden of proof necessarily rests upon the surety. He stands charged and must establish his discharge by proof of the alleged payment or fail of his defense. His reliance is upon the decree of the surrogate of Westchester county rendered upon the final accounting of Mills. There is a reference to that proceeding in the complaint which recites its existence as a matter of fact, but makes no admission of its authority or force as an adjudication. The statement of his account signed by Mills was available to the plaintiff as an acknowledgment by him of the amount due to her, without at all involving any responsibility for the surrogate's ultimate decree. When offered as an adjudication binding upon the plaintiff it was objected to as immaterial and incompetent and not binding on her unless it is shown that jurisdiction over her had been acquired, and the same objections are urged upon this appeal. The Surrogate's Court is one of limited and special jurisdiction and has and can assert it only in accordance with statutory provisions, except as to powers properly incidental thereto. The plaintiff, at that time about seven or eight years old, was represented on the accounting by William M. Skinner, the surrogate's clerk, an act very properly prohibited by later legislation, but his appointment was nugatory and ineffective unless first the infant was brought into court and jurisdiction over her acquired by the service of a citation in the manner prescribed by law. (*Ingersoll* v. *Mangam*, 84 N. Y. 622; *Davis* v. *Crandall*, 101 id. 321; *Crouter* v. *Crouter*, 133 id. 56.) In each of these cases it is explicitly held that there is no jurisdiction to appoint a special guardian for an infant until such infant has been brought into court by the service of process in the manner required by law. Until then there is no jurisdiction over the person of such defendant, and the prior appointment of a special guardian is an absolute nullity. The record in this case shows that the appointment of Skinner was made on the 19th day of February, 1874. That was the day

on which the citation was issued for that is the date which it bears. It was personally served on the minor in Canada on February 25, 1874, and proof of service sworn to three days later; and so the appointment is shown by the record to have been made before any service upon the infant, and when the court had acquired no jurisdiction over her. If it be said that the appointment, though premature, was preliminary and became good when filed and after due service on the minor, there are two answers. We have never, so far as I can discover, gone further in such a case than to hold the decree voidable at the election of the minor (*Crouter* v. *Crouter*, *supra*), and that election was made by her when, for the first time, the decree in its original form was sought to be used against her. The clause in it injurious to her was stricken out during her minority, and she had no occasion to resist it until it was sought to be used adversely. But a second answer is that there never was any valid service upon the infant at any time so that as against her the decree was not merely voidable, but absolutely void, and no power to appoint a special guardian ever accrued.

The proof of service contained in the record is as follows : first, an affidavit of John Hall, Jr., who describes himself as a brother of the plaintiff, that he served the citation on Mary Agnes Hall by delivering a copy to her and showing her the original at Camden, in the province of Ontario, Canada, where she was temporarily attending school, and that her residence was with her father in the county of Oneida, in this state ; second, affidavits of publication in a newspaper printed in Westchester county for a period of five weeks, and in the state paper at Albany for three months. No other evidence or proof was given, and the asserted jurisdiction must stand or fall upon that which the record discloses. I think it was clearly insufficient for several reasons. Service upon the child in Canada was inoperative because made outside of the jurisdiction and in a foreign country to which the process of the court could not run. Such a service is void and null at common law (*Litchfield* v. *Burwell*, 5 How. Pr. 346; *Jones*

v. *Jones*, 108 N. Y. 424), and never available except where
the statute explicitly permits it as such and makes it
effective by special enactment or authority. The statute
in force on the date of this service gave no such authority.
(3 R. S. [6th ed.] 101, § 74.) It merely directed a per-
sonal service which of course could only mean within the
jurisdiction since no permission was given to go outside of it
and validating the otherwise void service. Nor was there
any proof of service of a copy of the citation upon the
infant's father or any person with whom she resided. To
hand a citation to a child of tender years and on that to
found a jurisdiction is never permissible. When this
citation was first issued the rule in equity and at law
required service upon some one other than the child and
standing as its protector of sufficient discretion to understand
and heed the mandate. (*Knickerbocker* v. *De Freest*, 2
Paige, 303 ; Code [1864], § 134), and the rule of the Surro-
gate's Court was to follow the chancery practice. (*Matter of*
*Whitehead*, 3 Dem. 227.) But that which was the well
understood and lawful method was before the return day of
this citation explicitly commanded by statute. The act of
1874 (Chap. 156) passed April 10, 1874, and taking effect
immediately, enacted that minors were to be served and
citations issued and special guardians appointed in the same
manner as required upon the probate of wills and in no other
way. What that way is appears by § 55 of the article relat-
ing to such probate and requires not merely service upon the
child, but also upon the parent or guardian, or if there be
none, upon the person with whom the infant resides. There
is no proof of any such service. The unsworn memorandum
appended to one of the papers and signed " J. W. M." is of
course neither proof nor evidence. If somebody had told the
surrogate the same thing in the street it would be just as valuable
to confer jurisdiction. No one knows who put it where it
appears, or when it was made, or that the surrogate ever saw it,
and its date was unfortunate for it was four days after the special
guardian had been appointed. It is quite enough, however,

that it was not proof upon which the officer could act. But it is suggested that there was a sufficient service by publication. The three months notice in the state paper affects only non-residents and not a resident of the state who happens to be temporarily absent. On an accounting it was provided by § 74 of the earlier statute, that the citation should be served upon the parties living in the county of the surrogate personally at least fifteen days before the return day, upon those living out of that county or whose residence was unknown either personally or by publication in a paper of the surrogate's county *and* in a paper of such other county as would be most likely to reach the persons cited as the surrogate should direct. He never directed : there was no such additional publication, no inquiry by the officer and no direction founded upon it. The provision referred to is that contained in the Revised Statutes. (2 R. S. 93, § 61.) I have already said that a change was made in 1874 and controlled the surrogate's authority when the citation was returnable. That law authorized no publication except as to nonresidents. Where, as in this case, the infant resided in the state, but outside of the surrogate's county, the service was required to be personal, or by leaving it at her dwelling-house or other place of residence, with some person of suitable age. (3 R. S. [6th ed.] 65, 66, § 55.) So that under neither the old nor the new statute was there service of the citation in the manner required. We do not even know what was published. The record does not show. So far as it indicates anything the affidavits seem to refer to the citation preceding them, and which was issued February 19, 1874. But both publications began in October of the preceding year, and could not have covered a citation not yet issued, and we are able to see that the citation published whatever it was certainly was not the citation served on the infant the next year. If these difficulties could be surmounted another remains.

The section of the Revised Statutes relating to publication on an accounting, and that of 1837, referring to probate of wills, were both amended in 1863 (Laws of 1863, chap. 362,

§§ 1 and 5), so as to require as essential to service by publication that a copy of the notice as published shall be mailed to each of the persons served at least thirty days before the return day thereof. There is no pretense that this was done and no atom of proof tending that way before the surrogate. It will not help to say that although not mailed a copy was delivered to the infant for that delivered was a new and different citation, and was not a copy of the one published.

It is argued that since there was some evidence of service before the surrogate his conclusion thereon saves his jurisdiction. What there is of that rule has no application to the situation here disclosed. It is well settled that when certain facts are to be proved to a court having only a special and limited jurisdiction as a basis for its action, a total defect of evidence as to any essential fact will make its action void, while some proof of every such fact may enable it to proceed. (*Miller* v. *Brinkerhoff*, 4 Denio, 119; *Staples* v. *Fairchild*, 3 N. Y. 41.) The cases cited on behalf of the appellant contemplate a record in which there is some evidence of every material fact essential to the jurisdiction. Here, as we have seen, it is totally wanting as to almost every essential fact.

It is quite apparent, therefore, that the decree of 1877 in no manner affected the plaintiff, that it cannot be used against her or control her rights, and that there could not be, and in fact was not, any valid appointment of a special guardian to appear for her.

But in view of these difficulties, another position is assumed. It is claimed that the infant, if never before, became bound by the decree when she formally applied to have it amended, and authority is cited to that effect. (*Johnson* v. *Johnson*, 67 How. Pr. R. 144, 146.) If we should concede that doctrine to be sound, it would not help the matter. Her application was made in March of 1887, but five years before that, and in February of 1882, upon the application of Charles Hall, and while the plaintiff was a minor, the decree was amended by striking out the clause authorizing Mills to retain, as general guardian, the plaintiff's distributive share. Certainly, if her

motion to amend bound her to the decree, it could only be to the decree as it then existed, and not at all to something which the court itself had stricken out five years earlier. It follows, therefore, that the decree of 1877, so far as defendant relies upon it, did not bind the plaintiff, does not conclude her in any respect, gives no help or aid to the defense of payment, and leaves the sureties to show, if they can without its aid, that Mills was the lawful guardian of the infant, and that he did, by some act amounting to a payment, transfer the fund from himself as administrator to himself as guardian, so that the sureties upon his bond in the latter character became responsible for the money.

As we enter upon this inquiry, needless in one point of view, but prudent in another, the investigation shifts from the county of Westchester to the county of Oneida, and discloses in the office of its surrogate a very curious state of affairs. Since the infant and her father resided in that county, it was possible there to appoint for her a general guardian. The law authorized any relative or friend of an infant under fourteen years of age, to apply to the surrogate for the appointment of a guardian, and that officer was required to appoint a day for the hearing thereof, and give such notice to the relatives of the minor as, after inquiry, he should direct. (3 R. S. [6th ed.] 168, §§ 5, 6.) The defendant produced a petition asking for such appointment. Where it came from, we do not know. It was once in some form filed in the surrogate's office, under date of December 19, 1873, but that file mark is stricken out, and, as the evidence shows, the erasure was the act of the surrogate himself. The original was produced for our examination, and its erasures and alterations are very imperfectly represented in the printed case. It is quite obvious that its original form when filed was that of a petition by John Hall, the father, for his own appointment as general guardian of the infant, sworn to November 21, 1873, before James Ray, a justice of the peace, and filed in December following. It was never acted on. No day for hearing was appointed and no appointment of a guardian made under it.

On the contrary it was taken from the files by the surrogate himself, the file marked stricken out, the words "prays that you will appoint your petitioner John Hall," altered by erasing "your petitioner" and "John Hall" and inserting "John W. Mills" and so making it a petition by John Hall, the father for the appointment of Mills as general guardian. The original jurat was then stricken out and Hall swore to the new and altered petition before the surrogate on February 16, 1874. The original consent which read "I, John Hall, hereby consent" was altered by erasing the word "Hall" and substituting "W. Mills" so that it became the consent of John W. Mills which he signed. Of course the surrogate was not engaged in altering or mutilating his own records. He did not so regard the old petition which had never been acted on, but was deemed an inchoate and abandoned application which might honestly be altered to serve as a new one. The act itself, done by the surrogate himself, was either a criminal offense amounting to a forgery of the record, or a conclusive proof that he and Hall and Mills perfectly understood and admitted that the original petition had never been acted on and was but an inchoate and inoperative paper. We must assume that the changes were made by the surrogate at the date on which he administered the oath to Hall, and that Mills signed the consent at the same time. But we need not leave the matter upon that assumption merely, for it is inevitable that the change was made before the petition was presented to the officer, when it was so presented to him, or upon some day thereafter and the result is the same in either case. If the alteration was made before December 19th, then on that day there was no petition which could be presented and only a fraudulent paper not sworn to by anybody. If the change was made when presented, Hall was certainly not there, or if present refused to swear to or recognize the mutilated document and there was no sufficient petition or proof of anything. If the alteration took place afterwards the written consent of Mills was then for the first time given and did not exist on the nineteenth in violation of the

rule and practice which requires that the written con-
sent of the person to be appointed shall be executed
and filed with the petition and before the appointment is made.
Of course, as I have said, the verifying of the altered petition
by Hall was an admission by him and by the surrogate of the
most conclusive character that no guardian had been appointed
at the date of that verification. Its only 'honest object could
be to lay the foundation for an appointment thereafter to be
made, and it is inconceivable that the altered petition should
have been prepared for any other purpose. And yet it was
never filed in the surrogate's office. Where it went to or
what became of it we do not know except that it comes to
light in the hands of the counsel for the defendant. Two
months after it was sworn to Mills began his final accounting
in Westchester, and the decree which he procured, recites that
on the 17th day of April, 1874, proof was made of the service
of citations and that the surrogate "having ascertained" that
the minors "*then* had no general guardian," did, "thereupon,"
appoint Skinner special guardian. That appointment, as we
have seen, was made two months earlier. Of course the
information must have come from Mills, and he is bound by
the recital which he either directly authorized or knowingly
permitted to be made. What the sureties understood is evi-
dent from the will of Lyon which bears date October 31, 1885, in
which he refers to his liability on the administrator's bond, and
says of Agnes Hall that she "is not of age and has no general
guardian." So we have the surrogate of Oneida county, the
surrogate of Westchester, John Hall the father, Mills himself,
and his surety Lyon, all concurring that Agnes had no general
guardian, and yet the singular fact is shown that prior to all
these events, back of all these admissions, there were certain
inchoate, unfinished and imperfect proceedings preliminary to
the appointment of a guardian which indicate an existing
intention to appoint Mills as guardian, and all of which
occurred on the same 19th day of December, 1873, on which
the petition of Hall, for his own appointment, was filed. These
proceedings were two entries in the surrogate's book of minutes,

one ordering that John W. Mills be appointed upon executing a prescribed bond, the other ordering simply that he be appointed, both of which entries are signed by the surrogate, and in the guardian's book an unsigned appointment of Mills and unsigned letters of guardianship. There is also a bond of Mills and two sureties approved by the surrogate on the same day. The unsigned appointment and the unsigned letters show on their face that they were incomplete and inoperative, because they terminate with the words "in testimony whereof the said surrogate has hereunto set his hand," showing that until signed they were incomplete and nugatory. There never was any such "testimony." They show another thing. On the trial the plaintiff's counsel seemed to think that the petition, as originally drawn, was for the appointment of both Hall and Mills, and almost induced the surrogate to say so. One only needs to scrutinize the consent appended to it to see that any such theory is impossible. It was drawn for one person to consent — John Hall; it was altered for one person to consent — John W. Mills. The recital in the prepared letters is that the petition prayed for the appointment of Mills, and he had consented. We know that to be untrue. We know that the petition and consent never took that form until they were altered into it the next year by the surrogate himself. Both he and his clerk admit that he made the changes. There was thus no petition before the surrogate on December 19, 1873, for the appointment of Mills, and no written consent by Mills. It is clear that the alterations made by the surrogate in 1874 are totally inconsistent with the theory that any petition for the appointment of Mills, or any written consent of Mills, was before him on December 19, 1873, and yet on that date, in his book of minutes, are the two orders indicating his intention to appoint Mills not merely guardian of Mary Agnes, but guardian of all three minors together, and that on condition of his giving three separate bonds. Such is the form of the first order, and it is immediately followed by a second in precisely the same form except that there is no condition,

and the reason for which neither the surrogate himself nor anybody else can explain. I have found it impossible to frame any probable theory which will account for and harmonize all these singular contradictions. It would seem as if Mills expected to be guardian of the infants, prepared his bond December sixteenth, although again the printer's probable mistake dates it in November; so told the surrogate who prepared all the orders accordingly and withheld only his final and effective signature; that the petition furnished by Hall and perhaps on that day produced by Mills was filed without examination or observation, and when its real form was discovered, Hall was after some effort induced to consent to a change which would better match what had been attempted, but no one dared to put the altered petition on the files of the court and it passed into the hands of Mills and so reached the sureties who produced it. But that is merely a possible theory, and does not relieve us from the duty of determining whether the defendant has satisfied us that Mills was lawfully appointed general guardian of the plaintiff. The test is whether on the facts disclosed if the sureties on the alleged guardian's bond were sued we could hold them liable. I think we could not. The sole ground would be the entries in the minutes, but such entries do not constitute the appointment any more than an order for judgment in the minutes of the court constitutes the judgment. Such appointment results from several steps and culminates and is finished in the delivery of the signed and sealed letters, after their record in the guardian's book to the guardian. He gets no authority until they are signed and delivered, or at least are ready for delivery. Such is the practice and the law contemplates both. The act of 1837 as it is incorporated in the sixth edition of the Revised Statutes (3 R. S. 171, §§ 35 and 36) provides first that the guardian shall render and file annual accounts and then that the surrogate "shall annex to and deliver with each appointment of a general guardian" a copy of that requirement. And section 53 (p. 334) provides that unsigned letters of guardianship may in proper cases, to avoid all doubt, be signed by the surrogate's

successor with a view to their validity. Even that has not been done in the present case and should not be done under the existing facts. An order or direction in the minutes of the court that a person "be appointed guardian" is not an appointment made where such appointment is required to be made and certified and recorded in a particular manner, and it would introduce into the procedure of surrogates in the delicate and important matter of guardianship a degree of laxity which ought not to be permitted. I think it is a necessary conclusion of law from the facts disclosed that Mills never became the legally appointed guardian of the plaintiff.

Beyond that it is entirely clear that with the decree of 1877 out of the case, there is no evidence, and is not claimed to be any, which shows a transfer of the plaintiff's distributive share from the administrator as such, to himself, in any other capacity. The sole ground for that contention was an alleged transmutation of that liability, resulting as matter of law, from the operation of that decree. It is not needed that we consider that question, in view of our conclusion that the exception to the admission of the decree as binding on the plaintiff, was well taken. The sureties are, therefore, left to the operation of the decree against their principal, rendered on the accounting of his successor, and charging such principal with both liability and loss, and without opportunity to appeal to a prior decree for a defense. What the effect might prove to be of the later adjudication against the successor of Mills in administration, as a construction by the same court, of its own previous decree, and as denying utterly the force and effect claimed for that decree, we need not consider, in view of the conclusions which we have reached upon the question of jurisdiction.

On a review of the whole case, it seems to me that it would be a gross and inexcusable injustice to deny to this plaintiff a remedy for her wasted inheritance against the sureties of the administrator. Such sureties must remain liable until they can show lawful payment to parties legally entitled to receive it; and where the sole defense is a merely technical and construct-

ive transfer of liability from the same man in one capacity, to himself in another, it is not too much to require that it should be fully and clearly established, so as to leave no doubt of the liability of the substituted sureties, and that we should not make remediless the waste and injury done by turning the plaintiff over to a hopeless litigation, resting upon unsigned and altered records, and contradicted by every party to the proceeding itself.

The order of the General Term should be affirmed, with costs, and judgment absolute be rendered in favor of the plaintiff, upon the stipulation.

All concur.

Order affirmed and judgment accordingly.