Joseph W. Cutler by his will provided several small legacies and then gave the residue of his estate, one third to his wife and two thirds to one Gilpatric to hold in trust for his daughter, and named Gilpatric as executor. Gilpatric accepted and gave a bond, which was in the usual form except that it recited his appointment as "Executor and Trustee," and which was conditioned upon the faithful discharge of the "duties of said trust." Upon this bond, the defendant The United States Fidelity and Guaranty Company, hereinafter called the Fidelity Company, was the surety. In the course of the administration of the estate, Gilpatric found it desirable to sell the real estate included in it. He thereupon filed a bond, which recited that he had been empowered to sell the real estate, and which was conditioned that he "well and truly account for the avails of said real estate and administer upon the same and shall well and faithfully discharge the duties of said trust according to law." Upon this bond, the defendant The Royal Indemnity Company, hereinafter called the Indemnity Company, was surety. The executor sold the real estate and received the money paid for it. Thereafter he converted to his own use a considerable portion of the estate. This action is brought to recover the amount so converted; his successor in office as trustee, the beneficiary in the trust, and the testator's wife as legatee of the *Page 233 
other one third of the residue, being named as the persons beneficially interested in the recovery.
The complaint alleges the giving of both bonds and joins as defendants both the surety companies. The Indemnity Company demurred to it on the ground that it joined distinct causes of action against different defendants. The complaint recited that the plaintiff had no knowledge as to which of the defendants was liable, or whether both were, and if so, the amounts of the respective liabilities of each. The facts alleged are such as to bring the case within our practice permitting the joinder of causes of action, where the plaintiff is uncertain as to the liability of different defendants either or both of whom may be responsible for a violation of his rights. Practice Book, p. 278, § 155; Eames v. Mayo, 93 Conn. 479,106 A. 825.
No application or order for the sale of real estate appearing in the files or records, the plaintiff was entitled to prove that a document comprising the application and subsequent proceedings had once existed, had been lost, and what its contents were. Commonwealth
v. Roark, 62 Mass. (8 Cush.) 210, 212; Mandeville
v. Reynolds, 68 N.Y. 528, 533. The finding of the trial court that the bond of the Indemnity Company was in fact accepted and approved by the Court of Probate is amply justified by the circumstances appearing in evidence and we have no occasion to consider the suggestion in the brief of counsel that such an approval could be effective only as it was evinced by a written order, for no such question was distinctly raised on the trial, and no specific assignment of error presents it to us. The fact that the bond is dated September 19th, 1919, and refers to an order of sale "made this day," whereas the order is found to have been made on September 25th, 1919, is without significance; *Page 234 
there can be no question, in view of its terms and the surrounding circumstances, that the bond was intended to cover the liability arising out of a sale made in pursuance of the order of September 25th, and the evidence was sufficient to make it effective to that end; Shelinsky v. Foster, 87 Conn. 90, 96,87 A. 35; Bryant Electric Co. v. Stein, 95 Conn. 211,111 A. 204; in such a situation, certainly, the recital in the bond would estop the Indemnity Company from raising any question as to the actual date of the order.Village of Chester v. Leonard, 68 Conn. 495, 505,37 A. 397; 21 R.C.L. 999. The finding of the trial court that the order of sale included all the real estate of the deceased is amply sustained by inferences to be drawn from the testimony of the judge of probate and the other evidence on the trial.
The substantial objection of the Indemnity Company is that prior to Gilpatric's defalcation he had ceased to hold the property converted by him in his capacity of executor and was holding it as trustee. The Indemnity Company lays stress upon the filing in November, 1920, of an administration account by Gilpatric and its ultimate approval as filed, though this occurred after the defalcation. The bond it gave covered the obligation of Gilpatric properly to distribute the funds received from the sale of the real estate, and the surety upon the bond would be liable for his failure to do so, even though the account filed by him had been approved before the defalcation.State ex rel. Moriarty v. Donahue, 82 Conn. 308, 311,73 A. 763. It is of no moment, then, whether or not the filing of the account and its subsequent approval is to be regarded as establishing, as of the date it was filed, the performance by Gilpatric of all his duties save that of a proper payment of the fund to those *Page 235 
entitled to it. Until such a payment was made, the obligation secured by the bond was not discharged.
The trial court has found that Gilpatric never held two thirds of the residuary estate as trustee, and that he never held any of it as trustee, unless that is to be implied as matter of law from the other facts found. As the account he submitted in November, 1920, was not approved and no order of distribution was made until long after his defalcation, there was not, prior to it, any debt owing from Gilpatric as executor to himself as trustee, and hence no basis for the application of the doctrine by which, where a person in one capacity owes money to himself in another the law regards the debt as having been in fact paid. Burnside
v. Robertson, 28 S.C. 583, 6 S.E. 843. The virtual completion by Gilpatric of his duties as executor might give rise to a presumption that thereafter he held the fund in the capacity of trustee, but, at least as bearing upon the release of the Indemnity Company from further liability, that presumption would be one of fact and hence rebuttable. Pratt v. Northam, 5 Mason (U.S.C. C.) 95, 109. No implication of law arising in the case, the finding of the court that Gilpatric never held the residuary estate, or any part of it, as trustee, is a conclusion drawn from the subordinate facts and must stand, unless it violates some principle of law or it is shown to be unreasonable or illogical in view of the other facts found. Goodsell v. McElroyBrothers Co., 86 Conn. 402, 407, 85 A. 509.
Upon the basis of the account filed by Gilpatric in November, 1920, the amount of the estate which would have constituted the trust fund was $44,908.48. He had, as executor, opened a charge account in the National Bank of which he was cashier, in the name of "J. W. Cutler Estate." This account, the court has found, he used for other purposes than those connected *Page 236 
with the administration of the estate, and while this finding is attacked, a comparison of the bank statement showing the deposits and withdrawals with the items of his account establish the finding to be correct beyond any doubt. After filing his account with the Court of Probate, he drew checks upon this bank in payment of various small legacies given in the will, of the one third of the residue of the estate given to the testator's wife, and of certain succession taxes. At least three of the checks drawn in favor of legatees and that drawn to satisfy the succession tax, were not paid by the bank until January 5th, 1921. After they were paid, the balance of the account amounted to $4,528.22. Between that date and February 2d 1921, $19,048.14 was deposited therein, being amounts withdrawn from savings-bank accounts belonging to the estate, and on February 2d 1921, there was deposited a further sum of $21,503.25, the source of which cannot be determined, but which could not be property of the estate, because, with the other assets, it would have made the amount in the estate considerably in excess of property appearing anywhere in the inventory or accounts filed by Gilpatric. These deposits, with certain other small deposits and withdrawals, brought the balance in the account on February 14th, 1921, to $44,556.87. On that day Gilpatric withdrew and converted to his own use, $42,078, and thereafter and prior to March 28th, 1921, he withdrew and likewise converted the balance of the account. Thereafter all the assets of the estate which Gilpatric held were certain mortgages and other personal property received from the testator, of a total value of about $10,000.
This brief recital of salient facts shows that up to January 5th, 1921, the bank account was still being used by Gilpatric as executor, because checks drawn *Page 237 
by him in that capacity were paid from it on that day; that between that day and February 2d 1921, he did not have in his possession funds of the estate to the amount of the trust fund; and that thereafter the account in the bank represented not only assets of the estate, but other moneys as well, and hence there was in existence no identifiable fund which could be regarded as constituting the trust. It is true that Gilpatric made certain payments to the guardian of the beneficiary of the trust as income received from it, and after he had converted the bank deposits made statements to him and to the judge of probate as to investments he represented that he had made, indicating that he was then engaged in the administration of the trust; but the fact that he never in any probate proceeding claimed credit for those payments, and that the representations appear to have been essentially false, may well have been regarded by the trial court as indicating that he was engaged in an attempt to forestall any proceedings which might disclose his defalcation, rather than as characterizing the nature of his possession of the property to be that of trustee. The conclusion of the trial court that he was not holding the assets of the estate in the capacity of trustee certainly is not so unreasonable that we could refuse to accept it.
The trial court committed no error in holding the Indemnity Company liable upon its bond, and it therefore became necessary for it to apportion the amount between the two defendants. In effect the method it followed was this: It found the amount of the deficit by deducting from the total of all sums received by the executor, all payments which were properly made by him, and all sums representing items which could be traced as not having been misappropriated or as property which was turned over by him *Page 238 
to his successor in the trust; it determined the whole liability covered by the bond given by the Fidelity Company as being the whole amount of assets except real estate or its proceeds coming into the hands of the executor, and its primary liability by deducting from this sum the items just referred to as not having been misappropriated or as having been turned over to his successor, disregarding a commission paid on the sale of the real estate which was taken out of the purchase price and never received by the executor; it determined the primary liability covered by the bond of the Indemnity Company as being the amount for which the real estate was sold less that commission; and it then divided the liability for the defalcation between the two sureties in proportion to the primary liability it had found to be incurred by each. From this apportionment of liability the Fidelity Company appeals.
The real-estate commission was an expense so connected with the sale as properly to be charged against its proceeds rather than against the general assets of the estate; 3 Woerner on Administration (3d Ed.) p. 1676; 24 Corpus Juris, p. 705; and it was properly deducted in determining the primary liability of the Indemnity Company. Under our law charges against an estate for expenses of administration, debts and legacies are payable, in the absence of any directions to the contrary by will, from the personal property and until it has been exhausted are not charges upon the real estate.Canfield v. Bostwick, 21 Conn. 550; Duffield v.Pike, 71 Conn. 521, 529, 42 A. 641; Cleaveland, Hewitt Clark, Probate Law Practice, p. 674. If real estate is sold, its proceeds are to be divided and distributed in the same way as the land would have been; General Statutes, § 5015; and therefore such proceeds may not be used to pay the expenses of *Page 239 
administration, debts or legacies, if the land itself would not have been chargeable with them. Mr. Cutler's will contained no provision which would subject the land to the payment of these charges; on the other hand, it merely provided some small legacies, and then gave the residue of the estate, "both real and personal," to his wife and the trustee. It follows that Gilpatric had no right to use the proceeds of the real estate to pay such charges, and if he did so and loss came thereby to the persons entitled to receive them, the Indemnity Company would be liable. On the other hand, Gilpatric might have used the personal property to pay these charges, or have paid them from his own funds and later reimbursed himself from that property. Hence it follows that the Fidelity Company was entitled to have deducted from its whole liability upon the bond, to determine its primary liability in this action, the amounts paid by Gilpatric for expenses of administration, debts and legacies apart from the residuary gifts, and the Indemnity Company was entitled to no credits for such payments.
The residuary gifts might have been satisfied from either the personal estate or the proceeds of the lands, and, had either defendant shown that the property secured by its bond had gone to make up the amounts paid to or for the wife, it would have been entitled to credit that amount against its primary liability; but the burden to show that rested upon them; Potter v.Ogden, 136 N.Y. 384, 392, 33 N.E. 228; Choate v.Arrington, 116 Mass. 552; and both failed to sustain it. As, however, the deficit exceeds the whole amount received from the sale of the lands, the amount of this excess could only represent personal estate misappropriated; this amount should be charged against the Fidelity Company, and in the determination of its further liability, should be deducted from its primary *Page 240 
liability. On the other hand, the proceeds from the sale of the lands could only be used in satisfaction of the residuary gifts, and as all the property coming to the present trustee consists of specific items owned by the testator at his death, the amount found by deducting from the proceeds of the real estate the whole share of the testator's wife in the residue can definitely be placed as proceeds of the sale of the lands misappropriated by Gilpatric; this amount should be charged against the Indemnity Company, and should be deducted from its primary liability in the determination of its further liability. The balance of the deficit remaining after placing against the defendants the amount of these fixed liabilities must be divided between them in proportion to the primary liability of each less the amount of liability definitely ascertainable as chargeable to it.
The amount of the total deficit was $34,765.06; the total amount received from the sale of lands less the commission was $26,267.50, and the difference between these two amounts, that is, $8,497.56, can be definitely placed as representing personal property converted, and so, as a fixed liability of the Fidelity Company; the difference between the sum received from the sale of lands, $26,267.50, and the sum rightfully paid to or for the testator's wife, $22,367.41, that is, $3,900.09, represents a portion of those proceeds which can definitely be placed as not having been paid out as a part of the residuary gift, and so must be regarded as a fixed liability of the Indemnity Company; deducting these two items of fixed liability from the total defalcation, there remains $22,367.41, which cannot definitely be known to represent either personal property or the proceeds of real estate and the liability for which must therefore be divided between the two defendants. The whole liability of the Fidelity Company, *Page 241 
that is, the amount of personal property coming into the executor's hands, was $53,270.84; personal property to the amount of $9,869 can be definitely traced into the hands of the present trustee or as not having been misappropriated; charges, debts and legacies, aside from the residuary gift, were paid to the amount of $11,999.73; deducting these items, and also the amount of the fixed liability of this company above stated, $8,497.56, from the whole liability of this company leaves as the amount of its primary liability $22,904.55. The whole liability of the Indemnity Company, that is, the proceeds of the real estate less the commission, was $26,267.50; deducting from this the amount of its fixed liability, $3,900.09, leaves as its primary liability $22,367.41. Dividing the amount of the defalcation which cannot be definitely traced to either personal property or the proceeds of the real estate, as above stated, $22,367.41, between the two companies in proportion to their primary liabilities gives as the share of the Fidelity Company $11,317.91, and as the share of the Indemnity Company $11,049.50. The final liability of the Fidelity Company is determined by adding its share so found, $11,317.91, to the amount of its fixed liability, $8,497.56, making a total of $19,815.47; and the final liability of the Indemnity Company is determined by adding its share so found, $11,049.50, to the amount of its fixed liability, $3,900.09, making a total of $14,949.59.
 There is no error upon the appeal of the defendant The Royal Indemnity Company. There is error upon the appeal of the defendant The United States Fidelity and Guaranty Company, the judgment is set aside, and the cause is remanded with directions to enter judgment for the plaintiff to recover of the defendant The United States Fidelity and Guaranty